# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

CARLOS FERNANDO REIXACH MUREY,  )
as Administrator for the Estate of Carlos )
Lens Fernandez, a/k/a Carlos Lens, )
    Plaintiff, )
     )
v. )
     )   CIVIL ACTION 1:18-00275-KD-N
     )
THE CITY OF CHICKASAW, *et. al.* )
    Defendants. )

## ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Docs. 88, 94, 95, 96, 98), Plaintiff's Response (Docs. 107, 111, 112), Defendants' Reply (Docs. 116, 118, 119), Plaintiff's Sur-Reply (Docs. 123, 124) and Plaintiff's Supplement (Docs. 135, 136, 138).

## I.    Findings of Fact[1]

This case concerns decedent Carlos Lens (Lens) and the events surrounding his May 27, 2016 arrest for driving under the influence (DUI) in Chickasaw, Alabama. In his Complaint, Lens asserts the following claims: Count I -- Fourteenth Amendment violations as to Defendant Cynthia Burt (official and individual capacities); Count II  -- Fourteenth Amendment violations as to Defendant Michael Reynolds (official and individual capacities); Count III -- Fourteenth Amendment violations as to Defendant City of Chickasaw; Count IV -- Alabama state law Wrongful Death claims as all Defendants. (Doc. 1; Doc. 50 (amended) at 7-14).

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

Specifically, at approximately 2:06 a.m., on May 27, 2016, City of Chickasaw Police Officer Sgt. George "Tim" Taylor (Taylor) approached a stationary, running vehicle on or near the on-ramp for I-65 North in the City of Chickasaw. (Doc. 95-2 at 1 (Aff. Taylor); Doc. 95-1 at 5 (Alabama Uniform Arrest Report)). After Taylor contacted dispatch, City of Chickasaw Police Officer Gregory Michael Musgrove (Musgrove) responded to the scene. (Doc. 95-2 at 2 (Aff. Taylor)). Taylor approached the driver-side window while Musgrove approached the passenger side. (Id.). Per Taylor, "[t]he driver appeared to be asleep with a cellphone in hand while the vehicle was still running." (Id.). Musgrove turned the car off and removed the keys from the ignition. (Id.). Next Taylor woke the driver, Lens. (Id.). Lens woke up and tried to exit the car, which released his foot from the brake and the car began to roll forward. (Id.). Musgrove reached into the vehicle and activated the emergency brake to stop the car. (Id.).

After securing the vehicle, Taylor asked Lens for his driver's license and name. (Doc. 95-1 at 5 (Arrest Report)). When Lens stated his name, his speech was slurred and the officers observed a strong odor of alcohol. (Id.; Doc. 95-3 at 2-3 (Dep. Musgrove at 12-13); Doc. 95-2 at 2 (Aff. Taylor)). The officers asked Lens to exit the vehicle, after which Taylor escorted Lens to the rear of his car to administer three (3) field sobriety tests. (Doc. 95-2 at 2 (Aff. Taylor)). Taylor observed an open can of the alcoholic drink Four Loko in the center console of the car. (Id.; Doc. 95-1 at 5 (Arrest Report); Doc. 95-3 at 2 (Dep. Musgrove at 12)). Before administering the sobriety tests, Musgrove asked Lens if he had any health problems which would prevent him from completing the tests. (Doc. 95-2 at 2 (Aff. Taylor)). Lens replied that he did not. (Id.). Lens also stated he did not wear glasses or contacts. (Id.).

For the first test, the one-leg stand test, Lens was unable to maintain his balance. (Doc. 95-1 at 5 (Arrest Report)). For the second test, the nystagmus test, Lens was unable to follow the

object "smoothly" "and the angle of onset of nystagmus was prior to 45 degrees." (Id.). Lens refused to participate in the third test; he then told the officers "I'm drunk just take me to jail." (Id.; Doc. 95-2 at 2 (Aff. Taylor). Taylor arrested Lens and placed him in the back of his patrol car. (Doc. 95-2 at 3 (Aff. Taylor)).

When Lens and Taylor arrived at the City of Chickasaw jail at approximately 2:26 a.m., Taylor escorted Lens to the Draeger room for a breathalyzer test. (Id.; Doc. 107-2: Doc. 107 (Clip 2-B); Doc. 107-6 at 1 (AL Bureau of Investigations Video Timeline ("02:26:19 LENS enters Booking Room (camera 11), approximate actual time 2:46 AM.")). Per Taylor, Lens "was able to walk under his own power to the Draeger room." (Doc. 95-2 at 3 (Aff. Taylor)). This is confirmed by the jail video. (Doc. 107-2: Doc. 107 (Clips 2-B, 2-C)). The video shows Lens swaying at times, but sitting, standing and walking on his own. (Id.). The officers have their hands on him directing Lens movement, but not providing significant support. (Doc. 107-2: Doc. 107 (Clips 2-B, 2-C, 2-D)).

Taylor requested assistance from Chickasaw City Police Sergeant Burson (Burson) in administering the breathalyzer test because Lens was not staying properly seated in his chair. (Doc. 95-2 at 3 (Aff. Taylor); Doc. 95-4 at 2 (Aff. Burson)). It appears from the video that Lens periodically falls asleep while in the Draeger room and that Taylor has to lean Lens back into an upright position to prevent him from falling out of the chair. (Doc. 107-2: Doc. 107 (Clip 2-C)). However, Taylor was able to obtain two (2) samples for the Draeger test. (Doc. 95-2 at 3 (Aff. Taylor); Doc. 95-4 at 2 (Aff. Burson)). Lens registered a blood alcohol content of 0.12. (Doc. 95-2 at 3 (Aff. Taylor)). Thereafter, Burson and Taylor both escorted Lens to his cell, where he appeared to fall asleep. (Doc. 95-4 at 2 (Aff. Burson); Doc. 107-2: Doc. 107 (Clip 2-D)).

City of Chickasaw jailer/dispatcher Ariellia Taylor (Ms. Taylor) was the on duty jailer/dispatcher at the Chickasaw City Jail when Lens arrived. (Doc. 95-6 at 5 (Jail Log) (containing Ms. Taylor's shift notes); Doc. 107-11 at 8 (Dep. Ms. Taylor at 27) (affirming she made notes on the Jail Log)). Jailer/dispatcher duties included booking arrestees, intake paperwork, monitoring inmates, and notifying emergency personnel if necessary. (Doc. 95-8 at 3-5 (Dep. Burt at 22-23, 25); Doc. 95-14 at 2 (Dep. Cynthia Burt at 8) (jailer/dispatcher); Doc. 107-9 at 13, 18, 25-26 (Dep. Reynolds at 31, 41, 59-60) (Chief Public Safety Director)). See also (Doc. 107-10 at 5-6 (Jail Operations Order 12-36, eff. date 5-1-12)). CPR is not included in the list of Jailers/Dispatchers responsibilities according to the "Chain of Command 1003" description. (Doc. 95-1 at 9 (Chain of Command 1003)). See also (Doc. 107-4 at 3 (Dep. Burt at 13) (stating "we are not allowed to do CPR on anybody…we are to get EMS and we are not to go into the jail cell without an officer."); Doc. 95-7 at 3 (Dep. Reynolds at 16)).

The jailer/dispatcher administers a medical questionnaire as part of the booking process. (Doc. 107-4 at 17 (Dep. Burt at 36) ("The dispatcher and jailer ask the medical questions."); Doc. 95-7 at 16 (Dep. Reynolds at 40) (jailer participates in the medical evaluation of arrestees at intake)). If the arrestee cannot answer or refuses to answer, the arrestee can be placed in a cell for the questionnaire to be completed later. (Doc. 95-8 at 2-3 (Dep. Ms. Taylor at 21-22; Doc. 107-4 at 17, 19-20 (Dep. Burt at 36, 39-40) ("Sometimes they are disorderly and cannot answer the questions or they refuse to answer the questions. I've had some that has been drunk and disorderly and refused to answer the questions."); Doc. 107-11 at 11 (Dep. Ms. Taylor at 30) ("We do not ask all DUIs and all belligerent people those [intake] questions when they're unable or unwilling to give answers.")). Per Ms. Taylor, the purpose of the medical intake form is, "[i]n case they have an emergency or any medical problems, we can call EMS and EMS can look and

4

see what kind of medical problems they have or what medication they're on." (Doc. 107-11 at 10-11 (Dep. Ms. Taylor at 29-30)). The evidence indicates that "[i]nmates are evaluated by an EMT or at a hospital if they are unconscious, pregnant, undergoing severe withdrawals from alcohol or drugs, excessively intoxicated, or have a serious or major injury." (Doc. 95-12 at 2 (Burt's Resp. Interrog.)). According to Michael Reynolds (Reynolds), Chief Public Safety Director for the City of Chickasaw at the time in question, "[jailers/dispatchers] would have transported [the arrestee] to a medical facility or called for an evaluation from an ambulance[]" if it was determined an arrestee needed medical assistance. (Doc. 95-7 at 17 (Dep. Reynolds at 41)). Reynolds testified "excessively intoxicated" meant the arrestee had a BAC of 0.25 or higher; in that case, it was "Department policy" to seek medical assistance for the arrestee. (Doc. 95-1 at 1 (Aff. Reynolds)).

Ms. Taylor did not complete the normal intake process with Lens because he was "[u]nable or too intoxicated to stay up & use phone, answer questions, get fingerprinted or change clothes upon arrest." (Doc. 95-6 at 5 (Jail Log)). Ms. Taylor left a note on the Jail Log which read, "need photo, medical questions & changing out, & printing." (Id.; Doc. 107-11 at 8 (Dep. Ms. Taylor at 27) (affirming she left note)).

The Jail Operations Order requires "[a]ll inmates will be checked every 30 minutes and the time logged on the Jail Sheet by the on-duty docket personnel." (Doc. 107-10 at 6 (Jail Operations Order 12-36, eff. date 5-1-12)). The jailers/dispatchers perform these checks. (Doc. 95-7 at 12, 14-15 (Dep. Reynolds at 30, 35-36); Doc. 107-9 at 13 (Dep. Reynolds at 31); Doc. 95-14 at 10-11 (Dep. Burt at 40-41); Doc. 95-8 at 6 (Dep. Ms. Taylor at 38)). Despite the written department policy to check on inmates in 30-minute intervals, Burt testified "[w]hen I was trained, I was told to go by, you know every hour, and then if it's suicidal, do it—keep a closer

eye, every 15 to 30 minutes." (Doc. 95-14 at 10-11 (Dep. Burt at 40-41)). When asked "[w]hat was the policy [regarding inmate safety checks]," Ms. Taylor testified, "[e]very 30 minutes to an hour, check them." (Doc. 95-8 at 6 (Dep. Ms. Taylor at 38)).

The "Jail Operations Order" ("department policy") requirement that "[a]ll inmates will be checked every 30 minutes" does not specify the "check" method – whether visual checks via video monitors or physical checks by walking into the jail are needed. (Doc. 107-10 at 6 (Jail Operations Order 12-36, eff. date 5-1-12)). The jail has surveillance cameras that jailer/dispatchers use to monitor inmates. (Doc. 95-14 at 5 (Dep. Burt at 21); Doc. 95-7 at 12 (Dep. Reynolds at 30) ("Now, part of—the camera is part of [observing the inmates].")). Per Ms. Taylor, the 'policy' was to check on the prisoner "every thirty minutes to an hour. I also had monitors on them." (Doc. 95-8 at 6 (Dep. Ms. Taylor at 38)). Ms. Taylor testified further, "[t]here is no policy on the length of time" she had to observe the inmate during her checks. (Id. at 9). Per Ms. Taylor, to check on an inmate she had "[t]o visually look at them and know they're not—know that they're not hanging or trying to off their self in some way, whether they are sleeping." (Id.). Jailer/dispatcher Cynthia Burt (Burt) says, "I walk down to the jail cell and I check them. I cannot go in the jail cell, so I have to look through my bars, and I have—also I have a monitor—a camera…on my computer. Sometimes I get real busy and I can't get down to the jail, but I can watch them through my computer…the camera and I can keep a close eye on them that way." (Doc. 95-14 at 4-5, 10-12 (Dep. Burt at 20-21, 40-42)).

When asked if the jailers/dispatchers were required to physically walk in to the jail and look at the prisoners, Reynolds testified, "I think they're supposed to observe them." (Doc. 95-7 at 12 (Dep. Reynolds at 30)). Reynolds described these policies as guidelines. (Doc. 107-9 at 15 (Dep. Reynolds at 35)).

After Lens was placed in the cell, Ms. Taylor performed physical checks on Lens at 3:10 a.m., 4:14 a.m., and 5:26 a.m. (Doc. 95-6 at 5 (Jail Log)). Ms. Taylor observed Lens snoring and sleeping. (Doc. 95-8 at 9 (Dep. Ms. Taylor at 43)). The cell block lights were turned off at 4:00 a.m. and turned back on temporarily for each physical check thereafter. (Id.; Doc. 107-2: Doc. 107 (Clips 2-E, 2-F, 2-G, 2-H)).

Burt started her shift at 5:55 a.m. after Ms. Taylor. (Doc. 95-14 at 12 (Dep. Burt at 42); Doc. 95-6 at 5 (Jail Log)). Per the jail log, Burt received Ms. Taylor's note indicating Ms. Taylor had not completed the intake tasks for Lens. (Doc. 95-6 at 5 (Jail Log); Doc. 107-4 at 18-19 (Dep. Burt at 38-39)). According to Burt, "there was no standard procedure" requiring those tasks be completed in a set time but, "in the past" they were done "once arrestee is able." (Doc. 95-6 at 2 (Aff. Burt)). Burt performed physical checks on Lens at 5:59 a.m. and again at 7:49 a.m.[2] (Doc. 95-14 at 12 (Dep. Burt at 42)). Burt observed Lens sleeping at both checks and heard Lens snoring during the 7:49 a.m. check. (Doc. 95-6 at 2 (Aff. Burt); Doc. 95-14 at 7 (Dep. Burt at 23)). Burt visually checked on Lens via the surveillance monitors every five (5) to ten (10) minutes while doing her other dispatch tasks and "everything appeared to be normal." (Doc. 95-6 at 2 (Aff. Burt)). Burt stated that although the lights were off in the cell when she checked the monitor, she was able to see movement in the cameras if an inmate was moving around the cell area. (Doc. 95-14 at 9 (Dep. Burt at 27)).

When Burt tried to wake Lens at 8:38 a.m., he did not respond. (Doc. 107-2: Doc. 107 (Clip 2-I); Doc. 95-6 at 2 (Aff. Burt)). Burt left the cell block to call for backup because "[s]he would have to have backup" before entering jail cells. (Doc. 107-2: Doc. 107 (Clip 2-I); Doc. 95-

---

[2] The jail video shows the checks as occurring at 5:39 AM and 7:29 a.m. (video time stamp time). (Doc. 107-2: Doc. 107 (Clips 2-G, 2-H)). However, the Alabama Bureau of investigation determined that the video stamp time was 20 minutes behind the actual time. (Doc. 107-6 (AL Bureau of Investigations Video Timeline)). The parties do not dispute the ABI's finding.

7 at 18 (Dep. Reynolds at 42)). "Procedure prohibits Jailers/Dispatchers from entering the cell without backup." (Doc. 95-6 at 2 (Aff. Burt)). Burt immediately contacted Chickasaw Police Officer Wenzinger for assistance. (Doc. 107-2: Doc. 107 (Clip 2-I); Doc. 95-6 at 2 (Aff. Burt; )). Wenzinger examined Lens and told Burt to call emergency personnel. (Doc. 107-2: Doc. 107 (Clip 2-I); Doc. 95-14 at 14 (Dep. Burt at 43); Doc. 95-6 at 2 (Aff. Burt)). Burt testified that she called Chickasaw Fire and Emergency Services and notified officers using a radio while the other call was ringing. (Doc. 95-12 at 3 (Burt's Resp. Interrog.); Doc. 95-14 at 14 (Dep. Burt at 43); Doc. 95-6 at 2 (Aff. Burt)). The Chickasaw Fire Department arrived at 8:50 a.m. and began CPR on Lens. (Doc. 95-6 at 3 (Aff. Burt)). Emergency Medical Services arrived around 8:53 a.m. (Id.). Lens was pronounced dead at 9:14 a.m. (Id.).

Lens' toxicological report indicated the following: 0.065 g/100mL of ethanol in Lens' blood; 0.132 g/100mL of ethanol in his urine; 16 ng/mL of Alprazolam in his blood; and 0.089 g/100mL of ethanol in his vitreous humor. (Doc. 107-14 (Toxicological Analysis Report)). The autopsy report lists the Final Diagnoses as: "(I) Hypertensive and atherosclerotic cardiovascular disease; (A) cardiomegaly (620 grams); (B) severe coronary artery atherosclerosis; (C) mild aortic atherosclerosis." (Doc. 95-9 (5/28/16 Autopsy Report)). The autopsy states Lens' cause of death as "hypertensive and atherosclerotic cardiovascular disease." (Id.). However, the parties' respective experts have differing opinions as to the cause of death and provide alternate findings as discussed below.

## II.  <u>Standard of Review</u>

 "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Defendants, as the parties seeking summary judgment, bear the initial

responsibility of informing the district court of the basis for their motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make a

sufficient showing on an essential element of his case with respect to which he has the burden of

proof—that a genuine dispute of material fact exists—the moving party is entitled to summary

judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its

burden, the court must stop short of weighing the evidence and making credibility determinations

of the truth of the matter…the evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998–

99 (11th Cir. 1992) (internal citations and quotations omitted).

Summary judgment may nonetheless be appropriate in certain scenarios even with

conflicting versions of events. The Supreme Court has instructed that "[w]hen opposing parties

tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). When the

non-movant's assertion is "so utterly discredited" by the record, no "genuine" dispute of material

fact exists sufficient to prompt an inference on behalf of the non-movant. Id. at 381.

Finally, when qualified immunity is raised as a reason justifying summary judgment, the

Eleventh Circuit has stated district courts should "approach the facts from the plaintiff's

perspective because '[t]he issues . . . here concern not which facts the parties might be able to

prove, but, rather, whether or not certain given facts showed a violation of clearly established

law.'" McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009) (quoting Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002)).

### III.  <u>Section 1983: Fourteenth Amendment Claims</u>[3]

Murey asserts three (3) Section 1983 claims against Defendants for violations of his Fourteenth Amendment rights: 1) deliberate indifference -- Burt (individual and official capacity); 2) supervisory liability and deliberate indifference-- Reynolds (individual and official capacity); and 3) violation of custom or policy --- City of Chickasaw.

As recently enunciated in Brennan v. Thomas, 780 Fed. Appx. 813 (11th Cir. 2019) (*per curiam*), "the essential elements of a 42 U.S.C. § 1983 claim are: (1) the violation of a constitutional right or federal statute; and (2) that the violation was committed by a person acting under color of state law. 42 U.S.C. § 1983; Melton, 841 F.3d at 1220."

### A.  <u>Official Capacity Claims-- Burt & Reynolds</u>

**First**, the parties do not dispute that Defendant Burt was employed as a jailer/dispatcher for the City of Chickasaw or that Defendant Reynolds was employed as the Chief Public Safety Director for the City of Chickasaw. The evidence supports such as well. Thus, the Court is satisfied that these Defendants were acting under the color of state law at the relevant time.

Second, Murey asserts official capacity claims against Defendants Burt and Reynolds. These defendants were employees of the City of Chickasaw, Alabama. The Court finds that Plaintiff's Section 1983 claims against the individual Defendants in their official capacities are redundant and, therefore, due to be dismissed. These official capacity claims are "effectively an action against the government entity [t]he[y] represent[ ]—in this case.....[the City of

---

[3] Murey's Complaint does not specifically assert any Eighth Amendment violations.

Chickasaw]." Adcock v. Baca, 157 Fed.Appx. 118, 119 (11th Cir. 2005). As enunciated in

Riggins v. Stewart, 2019 WL 4725158, *6 (S.D. Ala. Sept. 26, 2019), this is because:

> ..."[o]fficial-capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent." Penley v. Eslinger, 605 F.3d 843, 854 (11th Cir. 2010) (citation omitted); Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) ("A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual.") (citation omitted). As a practical matter, then...[Murey's]...§ 1983 claims against Defendants in their official capacities functionally reduce to § 1983 claims against the State itself.

See generally Kentucky v. Graham, 473 U.S. 159, 167 (1985) (noting a higher standard in

official capacity suits because it ultimately imposes liability on the government); Brandon v.

Holt, 469 U.S. at 473 ("judgment against a public servant 'in his official capacity' imposes

liability on the entity that he represents."). Accordingly, the Court Plaintiff's Section 1983 claims

against Defendants Burt and Reynolds in their official capacities are dismissed because Plaintiff

has also brought Section 1983 claims against the City. See Hamilton v. City of Jackson, 508

F.Supp.2d 1045, 1055 (S.D. Ala. 2007) (dismissing claims as redundant).

**B.      City of Chickasaw**

For a municipality to be liable under Section 1983, "the entity itself [must be] a 'moving

force' behind the deprivation;" a municipality cannot be held liable on a *respondeat superior*

theory. Monell v. Department of Soc. Servs. of City of New York, 436 U.S. 658, 692 (1978). For

Murey to prevail against the City, he must show that Lens suffered a constitutional injury and

that the injury was caused by a policy, statement, ordinance, custom, regulation, or decision

officially adopted and promulgated by that body's officers. Young v. City of Augusta, Ga., 59

F.3d 1160, 1171 (11th Cir. 1995).

As to a policy or custom, Murey contends the City is liable because Reynolds failed to

operate the jail in accordance with written policy, train subordinates according to policy and

failed to reprimand officials who deviated from policy. (Doc. 50 at 10-11).[4] Murey asserts that

Reynolds' non-enforcement made it foreseeable that inmates' rights would be violated and that

such was the proximate cause of Lens' death. (Id. at 13).

There are "limited circumstances" in which an allegation of failure to train or supervise

can form the basis of Section 1983 liability. City of Canton, Ohio v. Harris, 489 U.S. 378, 388

(1989). Only where a municipality's failure to train its employees in a relevant respect evidences

a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly

---

[4] To the extent Murey asserts that Burt's actions impose liability on the City, the argument fails. It must be shown that an adopted policy or custom caused the constitutional violation, thus only those individuals with *final* policymaking authority can render an entity liable under Section 1983. Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996). Merely delegating discretionary authority to subordinate employees does not give that subordinate the authority to make policy. Mandel v. Doe, 888 F.2d 783, 792 (11th Cir. 1989). Stated simply: "the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily established that the municipality acted culpably." Board of County Com'rs of Bryan County, Okla. v. Brown, 520 U.S. at 405.

For a subordinate employee to impose Section 1983 liability on an entity, the delegation of authority to that subordinate needs to be such that the subordinate's actions are both unconstrained by official policies and not subject to review. Brown v. Neumann, 188 F.3d 1289, 1290-91 (11th Cir. 1999). The question of whether an official has such final policymaking authority is a question of state law; as is the question regarding whether such authority can be delegated. Mandel, 888 F.2d at 792 (noting this is specifically a role for the trial judge, not juries). In determining who has the final policymaking authority, courts look to "not only relevant positive law, including ordinances, rules, and regulations, but also the relevant customs and practices having the force of law." Id. at 793.

**Regarding Burt,** the City of Chickasaw defined her duties as a jailer/dispatcher as the following:

…prepares arrest reports identifying prisoners, charges assigned and other pertinent data; records the entry and release of prisoners; insures the safekeeping of all personal affects removed and the accounting of monies or valuables received from prisoners; assists in feeding and providing medical attention to prisoners; maintains security over the jail facility; answers telephone calls, dispatches police and maintains communications with them; enters and retrieves information through state and national databases; provides information and handles complaints, both in person and by telephone; prepares and submits reports as required and report any problems to the shift supervisor.

(Doc. 95-1 at 9 (Chain of Command 1003)). Thus, Burt was neither responsible for making official policy decisions, nor did she play a role in the decision-making process. Murey has not submitted any evidence to contradict this fact. Rather, as Burt testified: "[t]he chief, the captain" is responsible for those decisions. (Doc. 107-4 at 5 (Dep. Burt at 15)). Reynolds explained that he, worked with others to create department guidelines but he, alone signed off on the final policy. (Doc. 95-7 at 4 (Dep. Reynolds at 17)). In other words, Burt's actions were constrained by department policy, and her actions were subject to review. Brown v. Neumann, 188 F.3d at 1290-91. Therefore, Burt's actions could not amount to City policy.

thought of as a city "policy or custom" that is actionable under § 1983. City of Canton at 389.
So, where the policies on their face are constitutional, a plaintiff has to show the municipal
action was taken with deliberate indifference to obvious or known consequences. City of Canton,
489 U.S. at 388. For example, "[w]here a program does not prevent constitutional violations,
municipal decisionmakers may be put on notice that a new program is called for." Board of
County Com'rs of Bryan County, Okla., 520 U.S. 397, 407 (1997). Thereafter, "continued
adherence to an approach that [decisionmakers] know or should know has failed to prevent
tortious conduct by employees may establish the conscious disregard for the consequences of
their action—the 'deliberate indifference'—necessary to trigger municipality liability." Id.

First, Murey argues "[t]he policy to check on inmates at least every 30 minutes was
discretionary and there was no consequence to the jailer if the policy was ignored." (Doc. 50 at
11). For support, Murey submits evidence of deviations from department policy regarding inmate
checks, including the testimony of Reynolds, Burt, and Taylor and the department policy.
Department policy says, "[a]ll inmates will be checked every thirty minutes…" (Doc. 107-10 at 6
(Jail Operations Order 12-36, eff. date 5-1-12)). Per Reynolds, though, this policy was more of a
"guideline" jailers/dispatchers were to follow. (Id. at 14). And Burt testified that she was trained
to check every hour unless the prisoner was suicidal. (Doc. 95-14 at 10 (Dep. Burt at 40)). Ms.
Taylor also stated the "policy" was "[e]very 30 minutes to an hour, check them. I also had
monitors on them." (Doc. 95-8 at 6 (Dep. Ms. Taylor at 38)). From this evidence, Murey
contends that the lapse between when Burt checked on Lens at 7:49 AM and 8:38 AM was due
to non-enforcement of the 30 minute check policy.[5] Murey further contends that the failure to
check on Lens every 30 minutes contributed to his death. (Doc. 112 at 25).

---

[5] Burt disputes this assertion. She testifies that she performed visual checks over the surveillance cameras during this
time. (Doc. 95-6 at 2 (Aff. Burt)).

Second, Murey contends department policy with regard to arrestee intake forms, i.e. that arrestee intake forms be completed as soon as possible, was not enforced. Jailer/dispatcher Taylor testified to not completing intake forms for inmates who were "falling asleep or they are too drunk or belligerent." (Doc. 95-8 at 3 (Dep. Ms. Taylor at 22)). However according to Taylor, "[t]here was no standard procedure that required those [intake] tasks be completed by a specific time." (Doc. 95-6 at 1-2 (Aff. Burt)). Ms. Taylor's testimony suggested if an inmate is too intoxicated, some officers may make the decision to lock the prisoner in the cell instead of completing the intake forms. (Doc. 95-8 at 3-4 (Dep. Ms. Taylor at 22-23)).

Third, Murey argues, citing his jail expert, that there should be a policy requiring the lights to be on at all times in a jail. (Doc. 95-13 at 2 (Dep. Shull 55) (Plaintiff's Jail Expert) ("You never shut the lights off in a jail. If it's dark, No. 1 you can't see anything on the monitor; and No. 2, you can't detect anything going on.")). Murey further argues "[w]ith the lights turned off in the cell block area, Lens could not be seen well enough to be monitored." (Doc. 112 at 7).[6] From this evidence, Murey argues that the City of Chickasaw violated Lens constitutional rights by having a custom of turning the lights off. Reynolds stated there was not an official policy as to lighting in the cell area overnight; "[t]hat would be at the discretion of whoever is working." (Doc. 107-9 at 6 (Dep. Reynolds at 23)).

To establish a "deliberate or conscious choice" or such "deliberate indifference, a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any

---

[6] Murey cites Reynolds' testimony in support. Reynolds testified, "I think you can see the movement" in the cell area when the lights are turned off. (Doc. 107-9 at 8 (Dep. Reynolds at 25)). After reviewing the footage in the cell area though, Reynolds testified, "I don't see any movement" and that he could not see the prisoner at all. (Id. at 10). Ms. Burt and Ms. Taylor also testified that you can only see shadows of the inmates and only when they are moving around the cell. (Doc. 95-8 at 6; Doc. 95-14 at 9)

action." Board of County Com'rs of Bryan County, Okla. v. Brown, 520 U.S. at 407-09. For

example, "[i]t could... be that the police, in exercising their discretion, so often violate

constitutional rights that the need for further training must have been plainly obvious to the city

policymakers, who, nevertheless, are 'deliberately indifferent' to that need." City of Canton,

Ohio v. Harris, 489 U.S. at 397. There is insufficient evidence that either Reynolds' alleged non-

enforcement of policy or the department's training program resulted in constitutional violations

in the past so as to put the City on notice of a need for correction. It was not "plainly obvious"

that the policies/training/customs were deficient because there are no other reported incidents

linked to a policy of non-enforcement of or inadequate training in the areas of monitoring

inmates, completing inmate intake forms, or turning the lights off at night. City of Canton, Ohio

v. Harris, 489 U.S. at 397.[7] Thus, Murey has failed to submit sufficient evidence that the City

(through Reynolds acting in his official capacity) was deliberately indifferent to the need to train

or supervise its employees.

Murey also contends Reynolds failed to "order his subordinates to perform any life-

saving measures []" in the 12 minutes between when Lens was discovered and EMS' arrival.

(Doc. 112 at 33). Murey does not assert, nor does any evidence support, that this failure was a

---

[7] See Board of County Com'rs of Bryan County, Okla., 520 U.S. at 409-10 ("In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable."). There are no facts in this case to support that there was a high degree of predictability that a death would result from failure to monitor inmates every 30 minutes or from failure to timely complete intake forms.

customary practice of either the department or by Reynolds.[8] And the Court cannot assume this fact without supporting evidence. Thus, even assuming failure to perform CPR violated Lens constitutional rights, the Supreme Court has stated a single unconstitutional incident is insufficient to impose municipal liability under Section 1983. Oklahoma City v. Tuttle, 471 U.S. at 823-24. But even if it was the policy to wait for EMS, o hold the City liable under Section 1983, a custom or policy maintained by the government entity must at least contribute to the violation. Monell, 436 U.S. at 692. As explained *infra at p.24*, Murey has failed to present sufficient evidence to link the failure to administer CPR with Lens death. Thus, Murey's contention, that the City is liable for the failure of jail personnel to administer CPR during the 12 minutes before EMS arrived, fails.

## C.      **Individual Liability Claims -- Burt and Reynolds**

Murey has asserted Fourteenth Amendment claims relating to deliberate indifference and serious medical need/delay against Burt and Reynolds. Both Burt and Reynolds have asserted qualified immunity in response.

In Saucier v. Katz, the Supreme Court set forth a two-part test to determine if qualified immunity is appropriate. 533 U.S. 194, 201 (2001). First, the court must ask "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. Next, "if a violation could be made out on a favorable view of the parties' submissions…the next [question] is to ask whether the right was clearly established?" Id. "Unless a government agent's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the

---

[8] Murey summarily states that "Reynolds had another inmate die on his watch several years before Lens did." (Doc. 112 at 28). Murey fails to provide any evidence about the circumstances, much less whether the failure to provide CPR contributed to the death.

law would have done such a thing, the government actor has immunity from suit." Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1280 (11th Cir. 2002) (citing Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (abrogated on other grounds)).

### 1) Alleged Constitutional Violations

Lens was a pretrial detainee at the relevant time. Prisoners have a right to receive medical treatment for injuries and illnesses under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Deliberate indifference to serious medical needs is a constitutional violation. Id. The Fourteenth Amendment's due process clause extends this same protection to pretrial detainees and the same analysis applies here. Hamm v. DeKalb County, 774 F.2d 1567, 1573–74 (11th Cir. 1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment." Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003). To survive summary judgment in a case alleging deliberate indifference, the plaintiff must first show "some evidence of the prison officials' subjective awareness of a substantial risk of harm to an inmate." Goodman v. Kimbrough, 718 F.3d 1325, 1334 (11th Cir. 2013). "To be deliberately indifferent, a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994) (emphasis added)).

### a) Burt

Murey asserts deliberate indifference claims against Burt in her individual capacity for: 1) failing to complete intake paperwork as required by policy; 2) failing to monitor Lens as often as required by policy; 3) failing to call emergency personnel immediately and failing to

17

administer CPR or other life-saving measures. Murey's claims focus on Burt because at the time of Lens' death, she was the on-duty jailer/dispatcher at the Chickasaw City Jail. (Doc. 95-6 at 1 (Aff. Burt)). Per Burt's duties, she was responsible for monitoring Lens. (Id. at 2; Doc. 95-1 at 9 (Chain of Command 1003)).

### Failure to Complete Intake Paperwork

Murey initially faults Burt for failing to wake Lens after she arrived at 5:55 a.m. and ask him questions from the Inmate Medical Screening form. (Doc. 112 at 24). Murey argues that this inaction violated jail policy and is evidence of Burt's deliberate indifference. (Id. at 24-25). However, deviations from department policy, even if egregious, are insufficient to impose liability under section 1983. Goodman, 718 F.3d at 1334. In Goodman the court explained:

> [T]he fact that the officers deviated from policy or were unreasonable in their actions—even grossly so—does not relieve Goodman of the burden of showing that the officers were subjectively aware of the risk; in other words, he cannot say, "Well, they should have known." Were we to accept that theory of liability, the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not.

Goodman, 718 F.3d at 1334. The deliberate indifference theory of liability requires that Murey must also show Burt had a subjective awareness of the risk of harm to the inmate—that the official knew of the risk and deliberately disregarded it. Id.

Even assuming the evidence substantiates that a failure to complete medical intake forms posed a risk to Lens, the evidence does not indicate Burt knew of this risk yet chose to consciously disregard it.[9] Murey argues Lens' impairment as seen on the video was greater

---

[9] Carter opines, "On many occasions jail staff are unable to ascertain correct information from the subject being booked at the time they are brought in. This may be due to reasons such as: the inmate is irate and will not communicate rationally, the inmate is under the influence of a substance causing them to not communicate clearly or the inmate just refuses to answer the questions just to expedite the process….Persons, such as Mr. Lens, who are too fatigued to communicate while under the influence and showing no physical injuries and do not appear to be in distress, are normally allowed to answer the questions after they sleep and allow their intoxication level to drop. This is not uncommon." (Doc. 116-13 at 10-11 (Carter Expert Report)).

than expected for a 0.12 BAC level which should have then warranted a medical evaluation. (Doc. 112 at 10 (citing Doc. 107-7 at 11 (Shull Rebuttal Report 6/9/19 at ¶ 49))). The record reveals that at the time Burt knew that Lens had been arrested for DUI, had registered a 0.12 BAC, and that Ms. Taylor was unable to complete the inmate paperwork because he was "too intoxicated." (Doc. 95-6 at 1-2 (Aff. Burt)). Burt was not present at the jail when Lens arrived and did not observe video footage of his arrival. (Doc. 95-6 at 1 (Aff. Burt)). Rather, Burt arrived at 5:55 a.m., after which she observed Lens only sleeping and snoring. (Id.). Based on these facts, the only facts known to Burt at the time, no reasonable factfinder could conclude she was aware that Lens warranted a medical evaluation; much less, that she knew of a risk yet consciously disregarded it.

### Failure to monitor

Murey argues Burt was deliberately indifferent to Lens medical needs because she failed to check on Lens every 30 minutes as required by department policy. (Doc. 112 at 25). Moreover, Murey contends that the checks that were made were inadequate because visual surveillance of inmates using the camera monitors was impossible because the jail lights were off and Burt's physical checks of Lens were made without actually entering the hallway or properly observing Mr. Lens. (Id. at 6, 24).[10]

---

[10] Murey states that Lens called his estranged wife before getting arrested and said he was suicidal. With this fact, Murey contends Lens should have been monitored more frequently. Murey never contends police officials knew this fact but instead asserts had the proper questions been asked, it could have been discovered. (Doc. 112 at 6). Defendants, in their Reply, present deposition testimony from Lens' wife, Yenny Murey, regarding Lens' suicidal comments. (Doc. 116-12 at 4-5 (Dep. Y. Murey at 47-48)). Mrs. Murey testified that Lens told her he was going to kill himself after which Mrs. Murey called a few of Lens' friends to ask about his whereabouts and mental state. (Id.). Mrs. Murey testified that she did not notify law enforcement officers. (Id.). The Court finds Murey's contentions to be meritless. The officers were not required to conduct an investigation to discover family contacts and then contact family to determine medical or mental health history on an inmate who appeared intoxicated.

To prove the subjective element on a deliberate indifference claim, it is insufficient to show deviation from written policy. Goodman, 718 F.3d at 1334. Even evidence of gross deviations from written policy or unreasonable actions do not establish the subjective awareness element. In Goodman, where an impaired detainee was beaten by his cellmate, defendants failed to perform required cell checks, they deactivated an emergency call button without investigating the issue, and defendants failed to actually enter the cells when performing head counts. Id. at 1332. The court found the cell check and head count failures amounted to "negligence in its purest form." Id. The court found deactivating the emergency call button without any investigation amounted to gross negligence. Id. Even still, the Court found that the record lacked evidence indicating the officers deliberately disregarded a risk that the victim was in danger; thus, there was no evidence showing a subjective awareness of risk. Id.

The parties dispute whether Burt violated department policy.[11] (Doc. 95-6 at 2 (Aff. Burt) (testifying Burt performed visual checks every 5-10 minutes)). Assuming Burt's monitoring was inadequate because she did not physically check on Lens every 30 minutes and assuming she could not see Lens via the monitor, this is at most gross negligence. See Goodman, 718 F.3d at 1334 (finding officers negligent when they failed to perform inmate checks). "[N]o evidence presented would support a reasonable jury's finding that [Burt] harbored a subjective awareness that [Lens] was in serious danger while in his cell..." Id. As in Goodman, inadequate cell checks may be "negligence in its purest form," but they do not amount to deliberate indifference

---

[11] Testimony indicates the policy requiring inmates be checked every 30 minutes includes "physical" checks as well as visual checks." (Doc. 95-7 at 12 (Dep. Reynolds at 30 (acknowledging the 30-minute check policy but noting use of the cameras is included in that monitoring process); Doc 95-14 at 11 (Dep. Burt at 41) (noting she attempts to do physical checks every 30 minutes unless she's too busy)); Doc. 95-6 at 2 (Aff. Burt) (noting she performs visual checks using the camera monitors every 5-10 minutes between physical checks)). But see (Doc. 95-14 at 11-12 (Burt Dep. at 40-42) (noting Burt's on-job-training instructed her to check inmates every hour instead of every 30 minutes)). And see (Doc. 50 at 5 (alleging visual checks using the camera monitors were impossible with the lights turned off)).

standing alone. Id. Murey has not presented any facts which show Burt knew Lens was in distress and, with that knowledge, deliberately disregarded that risk. Id.

Murey also asserts Burt was willfully blind to the facts showing Lens distress. (Doc. 112 at 25-26). Specifically, Murey argues Burt ignored policy and the note from the jail log to complete the intake forms for Lens and in doing so, she was willfully blind to Lens' serious medical needs. (Id.). Therefore, Murey argues Burt should be charged with constructive knowledge of Lens serious medical need. (Id.).

"'[A] party that willfully blinds itself to a fact…can be charged with constructive knowledge of that fact' …Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness." Goebert v. Lee Cty., 510 F.3d 1312, 1327 (11th Cir. 2007) (citing United States v. Baxter Int'l, Inc., 345 F.3d 866, 902 (11th Cir. 2003)). Murey has not presented any evidence to support a finding that Burt was willfully blind to Lens' need for medical attention. It was practice to complete intake forms for inmates who initially could not complete the forms when the inmate woke up from his intoxicated state. (Doc. 107-11 at 8-9 (Dep. Ms. Taylor at 27-28); Doc. 95-6 at 2 (Aff. Burt)). Burt did not observe Lens when he was booked; she did not see the video footage of Lens arriving at the jail. Burt only observed Lens sleeping and snoring and was possibly aware that he registered a BAC of 0.12.

Murey's claim that Burt's alleged inadequate monitoring resulted in a violation of Lens' constitutional rights fails.

**Delayed Medical Treatment**

A delay in medical treatment for serious or painful injuries may amount to deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994). Whether a delay

constitutes deliberate indifference depends on the reason for the delay, the length of the delay, and the nature of the medical need. Id. at 393-94. The Eleventh Circuit has concluded that "an unexplained delay of hours in treating a serious injury states a *prima facie* case of deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990) ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference."). See also Estelle v. Gamble, 429 U.S. at 104, n. 11 (citing Hughes v. Noble, 295 F.2d 495, 495 (5th Cir. 1961)[12] (thirteen hours); and Fitzke v. Shappell, 468 F.2d 1072 (6th Cir. 1972) (twelve hours). Similarly, "[a] delay in care for unconsciousness…is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." Bozeman v. Orum, 422 F.3d 1265, 1273 (11th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson,* 135 S.Ct. 2466 (2015). "Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Colorado-Keen v. Rockdale County, Georgia, 775 Fed.Appx. 555, 569 (11th Cir. 2019) (citing Goebert v. Lee County, 510 F.3d 1312, 1327 (11th Cir. 2007)).

Here, it does not appear the parties dispute Lens' unresponsiveness when checked at 8:38 a.m. posed a serious medical need.[13] The issue instead focuses on whether there was a delay in responding, if so, the reason for that delay and its impact.

---

[12] Decisions issued by the former Fifth Circuit rendered prior to October 1, 1981 are precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

[13] Although the analysis must include an evaluation of whether there is evidence of a serious medical need, Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989), whether Lens' medical needs were serious does not appear to be in dispute. Therefore the Court assumes that Lens' medical needs were sufficiently serious to raise a deliberate indifference claim.

Murey argues that Burt was deliberately indifferent to Lens medical needs because after discovering Lens to be non-responsive she waited six minutes to call EMS, and because during the 12 minutes before the fire department arrived Burt did not "take any measures to attempt to save Lens." (Doc. 112 at 27). Murey implies that Burt should have been certified in CPR and that she should have administered CPR. Murey urges that the trier of fact may infer deliberate indifference because Burt essentially ignored Lens serious medical condition. (Id.). However, the facts as shown on the video and in the recorded calls do not support Murey's argument.

Burt found Lens unresponsive at 8:38 a.m. (Doc. 107-2: Doc. 107 (Clip 2-I)). The video shows that she immediately contacted a colleague to enter the cell with her to check Lens. (Id.). Thereafter, the video shows her rushing back to her office. (Id.). According to the audio recordings from the Chickasaw County Jail Dispatch, Burt immediately attempted to make contact with other police officers, including Reynolds, and then notified EMS. (Doc 136-2: Doc. 138 (Clips A-2, A-3, A-4)).[14] Per Mobile County EMS's report, EMS received the call at 8:44:53 a.m. (Doc. 107-5 at 1 (Prehospital Care Report Summary)). Burt reported "a possible death" as the emergency. (Doc 136-2: Doc. 138 (Clips A-2, A-3, A-4)).

The Court finds Bozeman v. Orum instructive with regard to Murey's contention. In Bozeman, the court found the officers acted with deliberate indifference when they carried an unconscious inmate, who was not breathing, from his cell to a northern corridor. 422 F.3d at

---

[14] Burt made two (2) back-to-back contacts with police officers, stating "respond to docket immediately." (Doc 136-2: Doc. 138 (Clips A-2, A-3). See (Doc. 107-4 at 22-23 (Dep. Burt at 42-43) (explaining the numbers beginning with '47' as badge numbers)). The automated timestamp states one contact occurred at 8:40:05 a.m.; the next call has a timestamp of 8:40:47 a.m. (Doc 136-2: Doc. 138 (Clips A-2, A-3)). Burt contacts EMS at 8:41:06 a.m. according to the audio recording timestamp. (Doc 136-2: Doc. 138 (Clip A-4)). The second contact with the officers lasted 36 seconds. (Doc 136-2: Doc. 138 (Clip A-3)). It does appear then from the recordings that Burt's second contact with officers occurred during her contact with EMS. (Doc 136-2: Doc. 138 (Clips A-3, A-4)). The timestamps on the recordings indicate that Burt contacted EMS within 3 minutes of finding Lens unresponsive. (Doc. 107-4 at 22-23 (Dep. Burt at 42-43); Doc 136-2: Doc. 138 (Clip A-4). See also (Doc. 112 at 3 (arguing Burt found Lens at 8:38 a.m.)).

1273. The court inferred the officers knew the inmates condition because the officers were in such close proximity to the inmate while carrying him. Id. Despite being aware of the inmate's condition, the officers, without explanation, "failed to check [the inmate's] condition, call for medical assistance, administer CPR or do anything else to help…" for fourteen minutes." Id.

Distinct from the officers in Bozeman, Burt took immediate action. (Doc. 95-6 at 2 (Aff. Burt)). Burt immediately called for help after finding Lens' unresponsive. (Doc. 95-6 at 2 (Aff. Burt)). Murey does not dispute this, instead Murey takes issue with the fact that Burt called other police personnel for help before calling EMS. (Doc. 112 at 26). However, from a review of the video and the recordings, no reasonable factfinder could find that Burt was deliberately indifferent to Lens' serious medical needs. She immediately took action and is clearly seen rushing to do so. (Doc. 107-2: Doc. 107 (Clip 2-I)). It may not have been the preferred action, it may have even been negligent or poor judgment not to call EMS first, and it may be a good policy for jail employees to be trained in CPR, but these facts do not support an argument for deliberate indifference.

Moreover, Murey has failed to show that the delay and failure to administer CPR impacted Lens. In an attempt to show the delay negatively impacted Lens, Murey cites Thomas A. Shull's (Shull) expert report which states the legal conclusion that, "[d]ispatcher/Jailer Burt acted with negligence and deliberate indifference by failing to complete the intake process and make proper safety and security checks at proper intervals as per department policy and by delaying calling Chickasaw Fire Department for approximately six (6) minutes after discovering Lens unresponsive. This was the proximate and actual cause of Lens' death." (Doc. 107-18 at 5 (Dep. Shull at 66)). Shull also states, without explanation, that the delay was "a contributing

factor" to Lens' death. (Doc. 107-18 at 7 (Dep. Shull at 74)).[15] However, Shull continues; "[w]e can't say if rescue was called right away that Lens could be revived. We can't say that. But I can guarantee after 12 minutes of no CPR, his fate was sealed." (Doc. 107-18 at 7 (Dep. Shull at 74)).[16] Thus, Shull's conclusory[17] and inconsistent testimony on this point is insufficient to show that any delay or failure to administer CPR by Burt impacted Lens.

But even if the Court accepted Shull's testimony, Murey has failed to show that the law was clearly established that failure to administer CPR while waiting on medical personnel to arrive is unconstitutional.

## 2. **Reynolds**

Murey asserts that Reynolds personally liable because he failed to staff and equip the jail and failed to train jailers/dispatchers. (Doc. 50 at 12-13). Specifically, Murey contends that Reynolds allowed the jailers to ignore the written policies which resulted in no medical intake of Lens, no evaluation by qualified medical personnel of Lens and the failure to properly monitor Lens. (Id.). Murey contends further that Reynolds personally participated in the alleged constitutional violation by not ordering subordinates to administer CPR. (Id.).

---

[15] In response, Defendants submit evidence from Expert Kevin DeAndrade, M.D., (DeAndrade) and EMS responder Anna Marie Stolfi (Stolfi). DeAndrade stated that Lens could not have been successfully resuscitated. (Doc. 116-7 at 3-4 (DeAndrade at 2-3)). DeAndrade based this on the fact that Lens' extremities were cold when Officer Wenzinger discovered Lens, suggesting Lens had been in cardiac arrest for at least five (5) minutes. (Id.). DeAndrade stated, "in the witness statement from Sgt Glen Wickell, it was noted that Mr. Lens was already exhibiting post-mortem lividity at the time he saw Mr. Lens which was before EMS arrived." (Doc. 116-7 at 4 (DeAndrade at 3)). According to DeAndrade, these facts suggested Lens "had expired more than the time window needed for CPR to be effective. At this point, there would be no reasonable expectation of survival even with the most aggressive medical efforts." (Id.). Stolfi noted Lens' extremities were cold to the touch when she arrived, which indicated to her that "they have been down for a while. Which when I say 'down for a while,' that means they've been dead for a while. So." (Doc. 116-5 at 4 (Dep. Stolfi at 30)).

[16] Murey also referenced reports which say the outcome for Lens would likely have been different if Lens was immediately transported to a hospital post-arrest. (Doc. 95-11 at 2, 7 (Dep. Maggio at 43, 65)). This opinion is irrelevant to Burt because she did not arrive at the jail until several hours after Lens was admitted and did not personally observe his state of being other than Lens sleeping.

[17] Shull's expert report was not provided to the Court.

"It is well established in this circuit that supervisory officials are not liable under §1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d at 1360 (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Id. at 1360-61. "The premise of a supervisory liability claim is that a supervisor's subordinate has inflicted a constitutional violation, but the supervisor either personally participated in the injury or there is an affirmative 'causal link' between the supervisor's conduct and the subordinate's infliction of the constitutional injury." Jenkins v. DeKalb County, Ga., 528 F.Supp.2d 1329, 1334 (N.D.Ga.2007), aff'd sub nom. Jenkins v. DeKalb Cty., Georgia, 307 F. App'x 390 (11th Cir. 2009). A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so. Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007)

**Custom of Non-enforcement**

To render Reynolds individually liable, Murey must prove that Reynolds' failure to enforce policies caused the constitutional violation. As explained *supra*, Murey has failed to show that Reynolds subordinates were deliberately indifferent to Lens' serious medical needs. Thus, because there was no constitutional violation by subordinates, Reynolds cannot be held personally liable for failure to enforce policies or train subordinates.

**Inadequate Staffing**

26

Murey contends Reynolds is individually liable because he inadequately staffed the jail because "the jailers/dispatchers had a host of duties in their position and that they could not check on inmates every thirty (30) minutes as written policy requires." (Doc. 112 at 32). Again, because the evidence is insufficient that Burt or other subordinates inflicted a constitutional injury of Lens, Reynolds alleged understaffing cannot result in personal supervisory liability.

**Personal Participation**

Murey contends that Reynolds' personal participation in the alleged constitutional violation allows the imposition of supervisory liability under Section 1983. Id.; Braddy v. Florida Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998). Specifically, Murey asserts Reynolds violated Lens' constitutional rights by not directing his subordinates to perform life-saving measures during the 12 minutes before medical personnel arrived. (Doc. 112 at 33). Murey has not disputed that Reynolds arrived after EMS. See (Doc. 119 at 9 (citing Doc. 107-2: Doc. 107 (Clip 2-I) (showing Reynolds arrived at the jail after EMS))). Presumably, Murey faults Reynolds for not ordering this action over the phone/radio before Reynolds arrived on the scene.

First, Murey has not presented evidence that Reynolds knew officers failed to administer life-saving measures. But even if Reynolds was aware, Murey's claim against Reynolds still fails for the fact that Murey has wholly failed to show that the failure to administer CPR contributed to Lens death. But even if the Court were to give weight to the conclusory and inconsistent statement provided by Shull that failure to administer CPR was a contributing factor to Lens death, Murey still has failed to show that the law was clearly established that law enforcement/jailers violate the Constitution by failing to administer CPR while waiting on medical personnel to arrive.

## VI.    <u>State Law Claim: Alabama Wrongful Death</u>

Murey asserts a state law claim pursuant to Alabama Code § 6-5-410 for wrongful death against all of the Defendants. However, as the Court has granted summary judgment as to each of Murey's federal (original jurisdiction) claims against these Defendants, the Court may also decline to exercise supplemental jurisdiction over Murey's wrongful death claim.

As explained in Gill v. Wells Fargo Bank, N.A., 2016 WL 4620372, *2 (S.D. Ala. Sept. 6, 2016):,

> ...the Eleventh Circuit "ha[s] encouraged district courts to dismiss any remaining state claims when ... the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (*per curiam*). <u>See</u> also United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999) ("[T]his Court has noted that 'if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims.' " (quoting L.A. Draper & Son v. Wheelabrator–Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984) (citing Gibbs, 383 U.S. at 726, 86 S.Ct. 1130))); Dockens v. Dekalb Cnty. Sch. Sys., 441 Fed.Appx. 704, 709 (11th Cir. 2011) (*per curiam*) ("Once the district court properly granted summary judgment for the School System on the FMLA claims, no federal claims remained. It was not abuse of discretion for the court to decline supplemental jurisdiction over the state law claim.").

<u>See</u> also <u>e.g.</u>, Lowe v. Smith, 759 Fed. Appx. 797, 809 (11th Cir. 2018) (affirming the lower court's dismissal without prejudice of the plaintiff's state law claims). In keeping with the Eleventh Circuit's guidance, the Court declines to exercise supplemental jurisdiction over Murey's Alabama wrongful death claim, and thus, this claim is dismissed without prejudice.

## VII.    <u>Conclusion</u>

Accordingly, it is **ORDERED** that the Defendants' motion for summary judgment (Docs. 88, 94, 95, 96, 98) is **GRANTED** on all claims, and Lens' wrongful death claim is **DISMISSED** without prejudice.

A Final Judgment consistent with the terms of this Order shall be entered by separate document as required by Rule 58 of the Federal Rules of Civil Procedure, **after the court addresses plaintiff's motion for sanctions.**

**DONE** and **ORDERED** this the **21st** day of **November 2019**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**